IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO
CIVIL DIVISION

CV

2015 03 0793

MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS

| | |
|---|---|
| **KATRINA ALLEN**<br>5608 ZOAR ROAD, LOT 277<br>MORROW, OHIO 45215 | : <br> : <br> : <br> :      **Case No.** <br> : <br> :      **JUDGE** <br> **Plaintiff,**    : <br> :      **COMPLAINT** <br> :      **& JURY DEMAND** <br> **v.**    : |

**KATRINA ALLEN**
5608 ZOAR ROAD, LOT 277
MORROW, OHIO 45215

     **Plaintiff,**

**v.**

**ABUBAKAR ATIQ DURRANI, M.D.,**
Pakistan
(Served via regular mail through
the Hague Convention)

And

**CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.**
(Served via regular mail through
the Hague Convention)

And

**WEST CHESTER HOSPITAL, LLC**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
SERVE: GH&R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified mail)

And

**UC HEALTH**
SERVE: GH&R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified mail)
     **Defendants.**



FILED BUTLER CO.
COURT OF COMMON PLEAS

MAR 31 2015

MARY L. SWAIN
CLERK OF COURTS

**Case No.**

**JUDGE**

**COMPLAINT
& JURY DEMAND**

<div style="text-align:right; border:1px solid; display:inline-block;">EXHIBIT A</div>

Comes now the Plaintiff, Katrina Allen ("Plaintiff"), and respectfully submits her Complaint and Jury Demand and states as follows:

## JURSIDICTION AND VENUE

1. This case was previously filed on April 9 2013, and was voluntarily dismissed pursuant to Civ.R. 41(A) on April 1, 2014.

2. At all times relevant, Plaintiff was a resident of, and was domiciled in, the State of Ohio.

3. At all times relevant, Defendant Abubakar Atiq Durrani, M.D. ("Dr. Durrani"), was licensed to and did in fact practice medicine in the State of Ohio.

4. At all times relevant, Defendant Center for Advanced Spine Technologies, Inc. ("CAST"), was licensed to and did in fact perform medical services in the State of Ohio and was and is a corporation authorized to transact business in the States of Ohio and Kentucky.

5. At all times relevant, Defendant West Chester Hospital, LLC ("West Chester Hospital"), was a limited liability company organized under the laws of Ohio and authorized to transact business and perform medical services in the State of Ohio including location, support staff, and billing services to physicians and employing physicians. West Chester Hospital , LLC is operated under the trade name "West Chester Hospital." The agent for service of process is GH&R Business Services, Inc., 511 Walnut Street, 1900 Fifth Third Center, Cincinnati, OH 45202.

6. At all times relevant, Defendant UC Health Inc. ("UC Health"), was a duly licensed non-profit corporation organized under the laws of Ohio, which owned, operated and/or managed multiple hospitals including, but not limited to, West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester

2

Hospital. The agent for service of process is GH&R Business Services, Inc., 511 Walnut Street, 1900 Fifth Third Center, Cincinnati, OH 45202.

7. At all times relevant herein, West Chester Hospital held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care, and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

8. UC Health is the corporate parent, owner, and operator of West Chester Hospital.

9. The amount in controversy exceeds the jurisdictional threshold of this Court.

10. The subject matter of the Complaint arises out of medical treatment by Defendants in Butler County, Ohio. Thus, this Court is the proper venue to grant Plaintiff the relief requested.

11. An Affidavit of Merit signed by Dr. Keith Wilkey, M.D., is attached as Exhibit A.

## FACTUAL ALLEGATIONS

12. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

### Plaintiff's Pre-Surgical History

13. In 2002, Plaintiff, a nurse, sustained a back injury when she was thrown across a room by a developmentally disabled client at her place of employment.

14. Since the 2002 injury, Plaintiff has suffered chronic low back and bilateral upper leg pain.

15. Plaintiff sought treatment at Goshen Family Practice. However, she did not improve with conservative treatment and was referred to Dr. Durrani for further treatment.

16. On or about October 27, 2010, Plaintiff underwent a lumbar magnetic resonance imaging test ("Lumbar MRI") at TriHealth.

3

17. As a result of the Lumbar MRI, the interpreting radiologist found that there was "no focal lumbar disc protrusion," but there was "Grade I spondylolisthesis with associated disc bulge at L4-5 . . . severe central canal stenosis and mild left foraminal narrowing. No significant right foraminal narrowing at this level."

18. On or about November 11, 2010, Plaintiff first began treatment with Dr. Durrani at the Blue Ash, Ohio CAST offices, then located at 4555 Lake Forest Drive, #150, Cincinnati, Ohio 45242 in Hamilton County, Ohio.

19. On the first office visit, Dr. Durrani noted that the MRI confirmed that with regard to the "L3-L5 spine regions, she had stenosis, anterolisthesis, and, subjectively, [that she] complained of radicular pain and motor weakness in lower extremities bilaterally."

20. On the first office visit, and within five minutes of meeting with her, Dr. Durrani told Plaintiff that she needed to have surgery.

21. Dr. Durrani did not offer, attempt, discuss, or recommend any conservative treatment options to Plaintiff prior to telling her that she needed surgery.

22. Dr. Durrani never explained to Plaintiff that her surgery would be an experiment.

23. Dr. Durrani promised Plaintiff that she would experience immediate pain relief following surgery.

**Events Surrounding Plaintiff's Surgery**

24. On February 18, 2011, Dr. Durrani performed a direct lumbar interbody fusion ("DLIF") surgery on Plaintiff, which included the following procedures:

    a.  L3-4, L4-5 lateral lumbar interbody discectomy and fusion

    b.  Insertion of interbody cage at L3-4, L4-5

    c.  L3, L4, L5 instrumented posterior spinal fusion

4

    d.  L4-L5 laminectomy

    e.  Local autograft, Vitoss allograft, and BMP use

25. During the February 18, 2011 surgery, Dr. Durrani implanted the following hardware:

    a.  Clydesdale PEEK cage IB 6 12x45 (Medtronic)

    b.  Clydesdale PEEK cage IB 6 10x45 (Medtronic)

    c.  Pin Stability 1 cm (Medtronic)

    d.  Set Scr F/G4 Int Hex (Medtronic)

    e.  Scr CAnn MA CDH 5.5 Leg 6.5x45 (Medtronic)

    f.  Rod Pre-bent M8 5.5x70mm TI (Medtronic)

26. In the course of Plaintiff's surgery, Dr. Durrani used BMP-2/Infuse, a bone morphogenetic protein biologic manufactured by Medtronic, Inc., during Plaintiff's February 18, 2011 surgery, without her consent or knowledge.

27. Dr. Nael Shanti assisted Dr. Durrani as the "primary surgeon" in Plaintiff's surgery and Dr. T. Husted performed the anterior exposure.

28. The Intraoperative Nursing Report shows that the surgery lasted 199 minutes. During this time, Dr. Shanti was present for 76 minutes, while Dr. Durrani was present for a total of 33 minutes at the end of the actual surgical procedure. Based upon this information, Dr. Durrani could not have been the "primary surgeon" in Plaintiff's surgery.

29. The Intraoperative Nursing Report shows that there were no surgeons present in the operating room for 28 minutes during the procedure.

30. Dr. Durrani did not dictate any operative notes following the procedure.

**Post-Surgical Events**

5

31. Despite Dr. Durrani's representations to Plaintiff that she would experience immediate pain relief post-surgery, her pain has been far worse and more extreme since the surgery.

32. Immediately following the surgery, Plaintiff began experiencing bilateral pain down both legs and extreme pain that had not been present prior to the surgery.

33. Following the surgery, this new pain and symptomatology never resolved or subsided.

34. On or about March 16, 2011, Plaintiff went to the Emergency Department at West Chester Hospital and presented with a fever ranging from 99.0 degrees to 102.8 degrees. At that time, she complained of back and leg pain, which she rated a 10 out of 10 on the pain scale. Because there was no apparent infection at the surgical incision site, Dr. Durrani prescribed drugs to Plaintiff and scheduled a follow-up in five days.

35. On or about March 24, 2011, at Plaintiff's first follow-up visit with Dr. Durrani, he stated that Plaintiff was doing well and was to follow up with Dr. Tayeb for pain control. Plaintiff's post-operative consultation occurred with Dr. Durrani at CAST.

36. Plaintiff's pain, numbness, and immobility did not resolve following the surgery, but Plaintiff continued to trust Dr. Durrani's assertion that over time, these conditions would improve.

37. Approximately six months after the surgery, during Plaintiff's second follow-up visit, Dr. Durrani again emphasized that "everything looks good" and told Plaintiff that she "did not understand it." He suggested, "Let's see what happens at 1 year."

38. During a January 20, 2012 visit at which Dr. Durrani evaluated Plaintiff concerning her continuing lumbar pain and her repeated falls related to weakened quadriceps, Dr. Durrani recommended another surgery in which he planned to extend the rods to other levels and to "grind off spurs." He indicated that other than surgery, Plaintiff would either

6

have to "deal with it" or get a TENS unit to manage her pain. Dr. Durrani did not dictate the notes from this visit until March 29, 2012.

39. Between February 27, 2012 (approximately one year after the surgery) and March 2, 2012, Dr. Tayeb implanted and then removed a spinal cord stimulator to help control Plaintiff's ongoing pain.

40. Dr. Durrani's last documentation regarding Plaintiff occurred on October 29, 2012.

### Plaintiff's Ongoing Post-Surgical Pain and Suffering

41. Plaintiff is irreversibly, permanently handicapped as a result of Dr. Durrani's actions.

42. Plaintiff has seen Dr. Zeeshan Tayeb, another CAST employee, numerous times for pain control both pre- and post-operatively. She continues to see Dr. Tayeb for severe pain management.

43. Dr. Tayeb has diagnosed Plaintiff with permanent, irreversible nerve damage.

44. Plaintiff sought treatment elsewhere with Dr. Jonathan Borden at Bethesda North/River hills.

45. Dr. Borden told Plaintiff she has permanent nerve damage.

46. Dr. Borden also told Plaintiff that the "anterior tips of the screws appear to violate the anterior margin of the cortical surface."

47. Plaintiff also treated with Dr. Brad Curt at the Mayfield Clinic in West Chester, Ohio and had a TENS unit or spinal cord stimulator implanted to control her ongoing pain, which was later removed because she obtained no benefit from it.

48. After the surgery, Plaintiff was required to start using a cane. The use of a cane had not been necessary prior to the surgery. Plaintiff will also possibly be confined to a wheelchair in the future.

49. Plaintiff is unable to drive, lift, or bend over since surgery.

50. Plaintiff's bowels no longer function properly.

51. Plaintiff can only sleep for a few hours at a time due to discomfort and chronic pain.

52. Plaintiff states that Dr. Durrani has "destroyed her life" and she feels like she functions at about 20% of what she was able to do prior to her surgery.

53. Plaintiff is depressed as a result of her unrelenting pain and sees a psychiatrist for treatment.

54. Plaintiff believes that she will also need a pain pump in order to function in her daily life and activities.

55. Plaintiff's husband does a majority of the housework because she is physically limited by pain as a result of the surgery.

**Defendants' Conduct**

56. Dr. Durrani misled Plaintiff concerning the extent, nature, and duration of the surgery that was to be performed.

57. Dr. Durrani misled Plaintiff about the after-effects of BMP-2/Infuse and the actual nature and extent of the surgery he had performed.

58. Defendants did not disclose their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the Food and Drug Administration ("FDA").

59. Prior to the surgery, Defendants did not obtain Plaintiff's consent to use BMP-2/Infuse.

60. During the surgery, Defendants experimentally used BMP-2/Infuse without Plaintiff's consent or knowledge.

8

61. During Plaintiff's surgery, Dr. Durrani did not use the required LT-Cage, but instead used a PEEK cage.

62. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

63. As a direct and proximate result of this surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

64. Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel informed Plaintiff of his propensity to use the drug.

65. Defendants fraudulently induced Plaintiff and her insurance company to pay for the surgery.

**INFUSE/BMP-2**

66. BMP-2 is a bone morphogenetic protein biologic and an artificial substitute for bone grafting in spine surgeries, used for the purpose of stimulating bone growth. It is manufactured, marketed, sold, and distributed by Medtronic, Inc. under the trade name "Infuse."

67. Dr. Durrani often used BMP-2/Infuse in an "off-label" manner when performing surgeries.

68. Dr. Durrani is a consultant for Medtronic, Inc.

69. Defendants did not inform Plaintiff of Dr. Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic, Inc.

70. Medtronic, Inc. provided in writing to Dr. Durrani and CAST the approved uses for BMP-2/Infuse.

71. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved BMP-2/Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

72. Use of BMP-2/Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

73. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

74. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four times greater than other bone graft alternatives.

75. Dr. Durrani, CAST staff and employees, and West Chester Hospital/UC Health personnel did not disclose to Plaintiff their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

76. Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic, Inc. or the FDA.

10

77. Plaintiff was not informed by Defendants at any time that Dr. Durrani used BMP-2/Infuse in her surgery.

78. Plaintiff would not have allowed BMP-2/Infuse to be used by Dr. Durrani in her surgery in a manner that was not approved by the FDA or Medtronic, Inc.

79. Plaintiff would not have consented to the use of BMP-2/Infuse in her body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester Hospital/UC Health personnel.

80. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of BMP-2/Infuse's use in her procedures.

81. Plaintiff never received a verbal disclosure of BMP-2/Infuse from Dr. Durrani, CAST staff and employees, or any West Chester Hospital/UC Health personnel.

82. Medtronic, Inc. specifically required BMP-2/Infuse only be used in "skeletally mature patients" with degenerative disc disease.

83. Medtronic, Inc. required at least six months of non-operative treatment prior to use of BMP-2/Infuse.

84. Dr. Durrani regularly used BMP-2/Infuse without this six-month non-operative treatment.

85. Medtronic, Inc. required BMP-2/Infuse to always be used in conjunction with a metal LT cage.

86. Dr. Durrani regularly used BMP-2/Infuse without a proper LT cage in his surgeries.

## PLAINTIFF'S CLAIMS AGAINST DR. DURRANI

### COUNT I: NEGLIGENCE

87. Dr. Durrani owed Plaintiff, his patient, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or

similar circumstances.

88. Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing Plaintiff's concerns.

89. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: BATTERY

90. Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2/Infuse in a way and for a surgery not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

91. Plaintiff would not have agreed to the surgery if she knew the surgery was unnecessary, not approved by the FDA, and not indicated.

92. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

93. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures

12

and surgical procedures performed by Dr. Durrani.  Dr. Durrani and CAST each required an informed consent release.

94. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

95. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgery and procedures.

96. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

97. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

98. Dr. Durrani's conduct as described above was intentional and reckless.

99. Dr. Durrani's conduct is outrageous and offends against the generally accepted standards of morality.

100. Dr. Durrani's conduct was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

101. Plaintiff suffered severe distress and anguish of a nature so serious that no reasonable man or woman would be expected to endure it.

## COUNT V: FRAUD

102. Dr. Durrani made material, false representations to Plaintiff and her insurance company related to Plaintiff's treatment including: stating the surgery was necessary, that more conservative treatment was unnecessary and futile, that Plaintiff would be walking

13

normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

103.     Dr. Durrani also concealed the potential use of BMP-2/Infuse in Plaintiff's surgery, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

104.     These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

105.     Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

106.     Dr. Durrani made the misrepresentations before, during and after the surgery with the intent of misleading Plaintiff and her insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgery, and to induce Plaintiff to undergo the surgery without regard to medical necessity and only for the purpose of receiving payment.

107.     The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

108.     Plaintiff was justified in her reliance on the misrepresentations because a patient has a right to trust her doctor and to trust that the facility is overseeing the doctor to ensure that the doctor's patients can trust the facility.

109.     As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgery which was paid for in whole or in part by her insurance company, and suffered all damages as requested in the Prayer for Relief.

## PLAINTIFF'S CLAIMS AGAINST CAST

## COUNT I: VICARIOUS LIABILITY

110.     At all times relevant, Dr. Durrani was an agent, and/or employee of CAST.

111.     Dr. Durrani is, in fact, the owner of CAST.

112.     Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

113.     CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

114.     CAST is vicariously liable for the acts of Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

115.     As a direct and proximate result of CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

116.     CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

117.     CAST and Dr. Durrani participated in experiments using BMP-2/Infuse bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

15

118. CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

119. The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

120. Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

121. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

122. Although the Ohio Consumer Sales Protection statutes, R.C. § 1345.01 et seq., exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

123. CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in R.C. § Section 1345.01(A).

124. CAST omitted, suppressed, and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions, and concealments as set forth herein.

125. CAST's misrepresentations, and its omissions, suppressions, and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of R.C. §§ 1345.02 and 1345.03 and to Substantive Rules and case law.

16

126.    CAST was fully aware of its actions.

127.    CAST was fully aware that Plaintiff was induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiff.

128.    Had Plaintiff been aware that CAST's representations as set forth above were untrue, Plaintiff would not have used Defendants' services.

129.    CAST, through its agency and employees, knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

130.    CAST's actions were not the result of any bona fide errors.

131.    As a result of CAST's unfair, deceptive, and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

a.    Loss of money paid

b.    Severe aggravation and inconveniences

c.    Under R.C. § 1345.01, Plaintiff is entitled to:

      i.    An order requiring that CAST restore to Plaintiff all money received from her plus three times actual damages and/or actual/statutory damages for each violation;

      ii.    All incidental and consequential damages incurred by Plaintiff;

      iii.    All reasonable attorneys' fees, witness fees, court costs and other fees incurred.

## PLAINTIFF'S CLAIMS AGAINST WEST CHESTER HOSPITAL/UC HEALTH

### COUNT I: NEGLIGENCE

132.    West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

133.    West Chester Hospital/UC Health, acting through its agents and employees, breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgery, and improper follow up care addressing Plaintiff's concerns.

134.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents, and other hospital personnel who participated in Plaintiff's surgery.

135.    The management, employees, nurses, technicians, agents and all staff, during the scope of their employment and/or agency, with West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

136.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the Prayer for Relief.

**COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION**

137. As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

138. West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and Joint Commission on Accreditation of Health Care Organziation ("JCAHO") rules by:

   a. Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with its full knowledge of the same;

   b. Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history, and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

   c. Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

   d. Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati-area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital, and Christ Hospital.

139. The Safe Medical Devices Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

140. As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: FRAUD

141. Plaintiff's counsel is requesting medical billing from West Chester Hospital/UC Health to aid in the pursuit of a fraud claim.

142. West Chester Hospital/UC Health either concealed from Plaintiff facts they knew about Dr. Durrani, including that BMP-2/Infuse would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

143. West Chester Hospital/UC Health's concealments and misrepresentations regarding BMP-2/Infuse and the nature and risks of Plaintiff's surgery were material facts.

144. Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

145. West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgery and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

146. Plaintiff was unaware that BMP-2/Infuse would be used in Plaintiff's surgery and, therefore, was unaware of the health risks of BMP-2/Infuse's use in Plaintiff's spine.

147. Had Plaintiff known before Plaintiff's surgery that BMP-2/Infuse would be used in her spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital/UC Health.

148. As a direct and proximate result of the fraud upon Plaintiff by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT V: OHIO CONSUMER SALES PROTECTION ACT

149. Although the Ohio Consumer Sales Protection statutes R.C. § 1345.01 et seq., exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

150. West Chester Hospital/UC Health's services rendered to Plaintiff constitute a "consumer transaction" as defined in R.C. § Section 1345.01(A).

151. West Chester Hospital/UC Health omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions, and concealments as set forth herein.

152. West Chester Hospital/UC Health's misrepresentations, and its omissions, suppressions, and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of R.C. §§ 1345.02 and 1345.03 and to Substantive Rules and case law.

153. West Chester Hospital/UC Health was fully aware of their actions.

154. West Chester Hospital/UC Health was fully aware that Plaintiff was induced by and relied upon West Chester Hospital/UC Health's representations at the time West Chester Hospital/UC Health was engaged by Plaintiff.

155. Had Plaintiff been aware that West Chester Hospital/UC Health's representations as set forth above were untrue, Plaintiff would not have used Defendants' services.

156. West Chester Hospital/UC Health, through their agents and employees, knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

157. West Chester Hospital/UC Health 's actions were not the result of any bona fide errors.

158. As a result of West Chester Hospital/UC Health's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

a. Loss of money paid;

b. Severe aggravation and inconveniences;

c. Under R.C. § 1345.01, Plaintiff is entitled to:

    i. An order requiring West Chester Hospital/UC Health restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

    ii. All incidental and consequential damages incurred by Plaintiff;

    iii. All reasonable attorneys' fees, witness fees, court costs and other fees incurred.

## COUNT VI: PRODUCTS LIABILITY

159. At all times, BMP-2/Infuse was a product as defined in R.C. § 2307.71(A)(12) and other applicable law.

160. West Chester Hospital/UC Health (aka supplier) supplied either Medtronic's (aka manufacturer) BMP-2/Infuse for surgery performed by Dr. Durrani on Plaintiff.

22

161.    West Chester Hospital/UC Health, as a supplier, failed to properly maintain BMP-2/Infuse.

162.    West Chester Hospital/UC Health did not adequately supply all components required to properly use BMP-2/Infuse.

163.    West Chester Hospital/UC Health knew or should have known of the FDA requirements and Medtronic's requirements for using BMP-2/Infuse.

164.    West Chester Hospital/UC Health stored BMP-2/Infuse at their facility.

165.    West Chester Hospital/UC Health ordered BMP-2/Infuse for surgery performed by Dr. Durrani.

166.    West Chester Hospital/UC Health did not adequately warn Plaintiff that BMP-2/Infuse would be used without all FDA and manufacturer required components.

167.    West Chester Hospital/UC Health did not gain informed consent from Plaintiff for the use of BMP-2/Infuse, let alone warn of the supplying of the product without FDA and manufacturer requirements.

168.    West Chester Hospital/UC Health failed to supply BMP-2/Infuse (aka product) in the manner in which it was represented.

169.    West Chester Hospital/UC Health failed to provide any warning or instruction in regard to BMP-2/Infuse, and failed to make sure any other party gave such warning or instruction.

170.    West Chester Hospital/UC Health intentionally billed BMP-2/Infuse as "Miscellaneous" to prevent Plaintiff's discovery of the use of BMP-2/Infuse.

171.    Plaintiff suffered physical, financial, and emotional harm due to West Chester Hospital/UC Health's violation of the Ohio Products Liability Act. Plaintiff's injuries were a foreseeable risk

172.    Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

173.    West Chester Hospital/UC Health knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable.

174.    West Chester Hospital/UC Health knew that the product did not conform to the representation of the intended use by the manufacturer and yet permitted the product to be implanted into Plaintiff.

175.    West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

176.    West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to warn Plaintiff that the product was being supplied without all FDA and manufacturer required components.

177.    West Chester Hospital/UC Health's actions demonstrate that they took advantage of Plaintiff's inability, due to ignorance of the product, to understand the consequences and implications of the product being implanted without FDA and manufacturer required components.

178.     West Chester Hospital/UC Health substantially benefited financially by the use of the product as the product allowed for West Chester Hospital/UC Health to charge more for the surgery.

179.     Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and other applicable law.

180.     Plaintiff suffered mental and physical harm due to West Chester Hospital/UC Health's acts and omissions.

181.     Plaintiff suffered emotional distress due to acts and omissions of West Chester Hospital/UC Health and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and other applicable law.

182.     West Chester Hospital/UC Health violated the Ohio Products Liability Act, R.C. §§ 2307.71-2307.80

183.     West Chester Hospital/UC Health violated R.C. § 2307.71(A)(6)

184.     West Chester Hospital/UC Health violated the Ohio Consumer Sales Practices Act, R.C. §§ 1345.02-.03.

185.     West Chester Hospital/UC Health provided inadequate warnings as defined in R.C. § 2307.76(A) and other applicable law.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict, and judgment against Defendants on all claims for the following damages:

1.     Past medical bills;

2.     Future medical bills;

3.      Lost income and benefits;

4.      Lost future income and benefits;

5.      Loss of ability to earn income;

6.      Past pain and suffering;

7.      Future pain and suffering;

8.      Plaintiff seeks a finding that her injuries are catastrophic under R.C. §2315.18;

9.      Plaintiff seeks all relief available under the Ohio Products Liability Act, R.C. §§ 2307.71-2307.80, and other applicable law;

10.     All incidental costs and expenses incurred as a result of her injuries;

11.     The damages to her credit as a result of her injuries;

12.     Loss of consortium;

13.     Punitive damages;

14.     Costs;

15.     Attorneys' fees;

16.     Interest;

17.     All property loss;

18.     All other relief to which she is entitled, including R.C. § 1345.01;

19.     Based upon the itemization of damages in numbers 1-18, the damages sought exceed the minimum jurisdictional amount of this Court, and Plaintiff seeks in excess of $25,000.

20.     Plaintiff also demands a declaratory judgment as to the unconstitutionality of R.C. § 2305.113(C) to the extent that it applies to this action.

Respectfully submitted,

Matthew J. Hammer (#0092483)
The Deters Law Firm
5247 Madison Pike
Independence, KY 41051
Ph: (859) 363-1900
Fax: (859) 363-1444
mhammer@ericdeters.com
*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff makes a demand for a jury under all claims.

Matthew J. Hammer

# EXHIBIT A

**KATRINA ALLEN**
**AFFIDAVIT OF MERIT**
**WEST CHESTER**

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Katrina Allen and the medical treatment of Katrina Allen at West Chester.

9. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

10. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

1

11. I have also reviewed the nursing summary prepared by legal counsel's office for Katrina Allen. Based upon the number of cases I've reviewed pertaining to Dr. Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

12. Based upon my review, the following are the **facts** I rely upon:

A. MEDICAL HISTORY: seizures since a head injury in 1997, hypertension, asthma, arthritis, smoked ½ pack cigarettes X 20 years.

In 2002, Katrina Allen, a nurse, was thrown across a room by a developmentally disabled client at work and sustained a back injury. Since that injury, she has had chronic low back / bilateral upper leg pain.
She was being treated by Goshen Family Practice (Barbara Neuman, NP). She did not improve with conservative treatment, so was referred to Dr. Durrani.
October 27, 2010, Lumbar MRI (TriHealth), the radiologist interpreted:
  • "No focal lumbar disc protrusion."
  • Grade I spondylolisthesis with associated disc bulge at L4-5. Secondary to degenerative facet changes. Results in severe central canal stenosis and mild left foraminal narrowing. No significant right foraminal narrowing at this level."

B. 11/11/2010: INITIAL OFFICE VISIT (CAST) Dr. Durrani stated: "Four months ago, her low back and bilateral leg pain significantly worsened for unknown reasons. According to Ms. Allen, he recommended surgery" within five minutes". He noted that, confirmed by MRI, "the L3-L5 spine regions, she had stenosis, anterolisthesis, and, subjectively, complained of radicular pain and motor weakness in lower extremities bilaterally". He recommended surgery.

C. She saw Dr. Tayeb (also of C.A.S.T.) numerous times for pain control, both prior to surgery, and postoperatively, for epidural injections and oral pain medications, Neurontin, topical pain cream, back brace, TENS, etc. She continues to see Dr. Tayeb for management of severe pain.

D. 02/18/2011 SURGERY (WCH): DLIF L3-L5
According to Dr. Nael Shanti's operative note, Dr. Durrani was the primary surgeon, with Dr. Shanti assisting. Dr. T. Husted performed anterior exposure.
Of note: The Intraoperative Nursing Report shows:
  • Surgery "start time" was 0900; "out time" was 1219 (199 minutes)
  • Dr. Shanti was present for 76 minutes (0938-0958 and 10:31-11:27)
  • Dr. Durrani was present for a total of 33 minutes at the end of the actual surgical procedure (1132-1205). Dr. Durrani could not have been primary surgeon.

2

- There were no surgeons between 1003 and 1031.
- Both Drs. Shanti and Husted each broke scrub three times throughout this surgical procedure.

E. Ms. Allen went to West Chester Hospital E.D. on 03/16/2011, for fevers, ranging from 99.0°-102.8°, back/leg pain rated 10/10. The surgical incision showed no signs of infection. Lumbar films were unremarkable. Dr. Durrani advised Keflex, Toradol, and to see him in five days.

F. On 03/24/2011, Dr. Durrani stated that she was doing well, ordered physical therapy, and to follow up with Dr. Tayeb for pain control. Physical therapy aggravated her pain.

G. Between 02/27/2012 and 03/02/2012, Dr. Tayeb implanted, then removed a spinal cord stimulator after a successful trial period.

H. On 03/29/2012, Dr. Durrani evaluated Ms. Allen for continuing lumber pain, and multiple falls related to weakened quadriceps. He read a lumber MRI lumbar: "L2-L3 disc herniation, bilateral foraminal stenosis". His note stated: "we are going to do a foraminotomy, decompression, hemilaminectomy on the right side". According to Ms. Allen, "Dr. Durrani recommended another surgery to extend the rods a level above and a level below the original implant and 'grind off spurs'. Other than surgery, he advised her that she could "deal with it" or "get a TENS unit".

I. On 04/03/20112, Dr. Brad Curt, of Mayfield Clinic, implanted a spinal cord stimulator. The SCS was problematic, needing several adjustments, and was eventually removed a year later by another neurosurgeon, Dr. Gregory Howes (Riverhills Neurosurgery), because she obtained no benefit from it.

J. Included with documentation are:
- A letter from Ohio KePro, a Quality Improvement Organization, requesting documentation from Dr. Durrani that he provided specific risks and/or benefits in the operative notes or in the operative indications for the procedure. A copy of the consent that Ms. Allen signed on February 11, 2011 and office notes from November 11, 2010 and February 8, 2011 were provided to Kepro. No further actions were documented.
- Dr. Durrani's letter in response to an insurance company stating that "no specific injuries were caused by an auto accident on June 18, 2011", where her car was rear-ended. "No new injuries were a result…, only acute exacerbation of previous symptoms".

3

K. Within five minutes of first meeting Dr. Durrani recommended surgery.

L. Dr. Durrani performed one surgery on the client:
02/18/2011 SURGERY (WCH): PROCEDURES:
- L3-4, L4-5 lateral lumbar interbody diskectomy and fusion
- insertion of interbody cage L3-4, L4-5
- L3, L4, L5 instrumented posterior spinal fusion
- L4-L5 laminectomy
- Local autograft, Vitoss allograft, and BMP use
PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
- L3-L4, L4-L5 degenerative disc disease
- L3-L4, L4 Stenosis
- L3-L4, L4 spondylosis

M. BMP-2 was used during surgery:
02/18/2011 SURGERY (WCH): Infuse (Medtronic)/ Vitoss Foam (Orthovita)

N. The following hardware was implanted:
02/18/2011 SURGERY (WCH):
- (1) Clydesdale PEEK cage IB 6 12 X 45 (Medtronic)
- (1) Clydesdale PEEK cage IB 6 10 X 45 (Medtronic)
- (1) Pin Stability 1 cm (Medtronic)
- (5) Set Scr F/G4 Int Hex (Medtronic)
- (5) Scr CAnn MA CDH 5.5 Leg 6.5 X 45 (Medtronic)
- (2) Rod Pre-bent M8 5.5 x 70 mm T1(Medtronic)

O. Operative Report Dictations:
02/18/2011 SURGERY (WCH): 03/11/2011, dictated by Dr. Nael Shanti
NOTE: Durrani is listed as surgeon on operative report, but was dictated by Dr. Shanti. Dr. Durrani was present during surgery for 33 minutes out of 199 minutes of surgery time. Dr. Shanti is listed on Intra-op note as primary surgeon

P. The client has seen the following subsequent treating physicians:
- She continues to see Dr. Tayeb for pain management. Currently, she is undergoing a medial branch block injection series for her right SI joint pain. She is doing physical therapy. Dr. Tayeb told her that she has permanent, irreversible nerve damage, so, eventually faces wheelchair confinement. She has used a cane since her surgery. She also will likely need implantation of pain medication pump.
- She has suffered from severe depression since her surgery, and sees a psychiatrist, Dr. Bernard DeSilva (Milford Psychiatric Practice).

4

Q. Ms. Allen continues to have pain right lumbar area to right leg, difficulty emptying her bladder completely, and constipation secondary to pain medications (Fentanyl patch and Vicodin) she needs in order to function at all. Her pain is constant.

R. Since being treated by Dr. Durrani:
- Unable to drive, lift, or bend over since surgery.
- She states "he destroyed my life". She feels like she functions at about 20% of what she was able to do prior to her surgery.
- Her husband does most of the housework, because she is so limited physically.
- Must use a cane for ambulation, due to right leg weakness. She faces future wheelchair confinement.
- Irreversibly, permanently handicapped
- Depressed and sees a psychiatrist.
- Permanent nerve damage
- Continues to be seen by Dr. Tayeb regularly for pain management.
- Probably will need a pain pump in order to function.

13. Based upon my review, the following are my opinions based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani, CAST, West Chester and UC Health which proximately caused harm to Plaintiff:

A. Need to have additional surgery to repair problems created by Dr. Durrani

B. Implantation of Puregen without informed consent

C. Implantation of BMP-2 without informed consent

D. Failed hardware

E. Failure to obtain proper informed consent for surgery

F. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

G. Failure to properly post-op monitor the patient

H. Failure to properly perform follow up, post-op care

I. Negligent surgical techniques

5

J.  Failure to maintain accurate and complete surgical records and surgical consent forms

K.  Failure to disclose important health information to patient

L.  Failure to maintain and complete discharge summary

M.  Failure to supervise Dr. Durrani

N.  Negligent pre-surgical diagnosis

O.  Failure to prepare a timely operative report or other medical record

P.  Billing for services not completed

Q.  Not informing the patient another surgeon will be doing all or part of the surgery

R.  Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

S.  Deviation in standard of care

T.  Failure to perform thorough and accurate pre-op nonsurgical evaluation

U.  Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

V.  Failure by CAST to disclose additional/changed procedure and reason to patient

W.  Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

X.  Prior knowledge of possible complication and not acting properly upon same

Y.  Failure to disclose pertinent health information to another health care provider

Z.  Fraudulent, negligent and reckless pre-operative work up

AA.  Fraudulent, negligent and reckless surgery

BB.  Inaccurate, fraudulent, and/or exaggeration of diagnoses

CC.  Failure to properly educate patient regarding diagnoses

6

DD.    Failure to attempt non-surgical conservative treatment

EE.    Failure to perform thorough and accurate pre-op nonsurgical evaluation

FF. Failure by Dr. Durrani at UC/West Chester Hospital to perform accurate and complete preoperative teaching

GG.    Failure by Dr. Durrani at UC/West Chester Hospital to properly educate patient regarding diagnoses

HH.    Failure by Dr. Durrani at UC/West Chester Hospital to maintain accurate and/or complete medical records

II.    Failure of informed consent by Dr. Durrani at UC/West Chester Hospital

JJ. Failure of UC/West Chester Hospital to insure Dr. Durrani and CAST had obtained proper informed consent

KK.    Failure of UC/West Chester Hospital to obtain proper acknowledgement of consent

LL. Failure by Dr. Durrani at UC/West Chester Hospital to disclose pertinent health information

MM.    Failure by UC/West Chester Health to disclose additional/changed procedure and reason to patient

NN.    Failure by UC/West Chester Health to supervise staff

OO.    Failure by UC/West Chester Medical staff to properly document abnormalities and follow up care

PP. Non-approved hardware combinations

QQ.    Dr. Durrani made false and material misrepresentations of material facts intended to mislead Katrina Allen and concealed material facts he had a duty to disclose. UC/West Chester Health and CAST concealed material facts they had a duty to disclose. Katrina Allen was justified in relying on the misrepresentation and did rely proximately causing harm to Katrina Allen. Dr. Durrani, CAST, and UC/West Chester Health intentionally misled Katrina Allen. Katrina Allen had the right to correct information.

14. The testimony, facts and exhibits of Brenda Shell's Response to Motion for Summary Judgment and Exhibits to same are applicable to all the claims against West Chester Medical Center (WCMC) and UC Health for all claims, including negligent retention and credentialing brought by Plaintiff.

7

15.     Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff.  WCMC and UC Health are both being referenced when only WCMC is named.  I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their administration and MEC.  The time period covered is from the time Dr. Durrani sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges.  In addition to my opinions, I set forth facts I rely upon.  This includes all which I referenced that I reviewed.  In addition to all of the above, I attest to the following:

## FACTS

1.  According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2.  According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

3.  According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4.  According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5.  According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6.  According to risk manager, David Schwallie, risk management knew Durrani had issues.

7.  According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8.  According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr. Durrani.  This infers a poor environment of honesty and disclosure before this policy.

9.  According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

8

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

9

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. Jill Stegman confirms Gerry Goodman's complaints.

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what Plaintiff claims Durrani was doing.  (Despite what his bylaws state.)

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

10

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

55. According to Vicki Scott, Dr. Durrani was a behavior problem.

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr. Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to

12

enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

71. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert.

13

Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC under the standards of Ohio as detailed in the Brenda Shell's Response to Motion for Summary Judgment and this proximately caused harm to Plaintiff.

83. The facts support Katrina Allen's claim for negligence, battery, lack of consent and fraud.

84. As a result of the negligence and conduct of Dr. Durrani, CAST, West Chester and UC Health, Katrina Allen suffered damages proximately caused by them, including the following:

A. Permanent disability
B. Physical deformity and scars
C. Past, Current and Future Physical and Mental Pain and Suffering
D. Lost income past, present and future
E. Loss of enjoyment of life
F. Past medical expenses
G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
H. Aggravation of a pre-existing condition
I. Decreased ability to earn income
J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____

KEITH D. WILKEY, M.D.

<u>NOTARY</u>

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ___14___ day of October, 2014.

NOTARY PUBLIC

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11139613

14

My Commission Exp.: 07/18/2015

St Charles County

State of Missouri

15

# EXHIBIT B

# UC Health.

P.O. Box 740117
Cincinnati, OH 45274-0117

**ITEMIZED BILL**

TAX ID: 311588499

04/24/13

1 of 5

| ALLEN, KATRINA | | | | |
|---|---|---|---|---|
| WEST CHESTER HOSPITAL | 220090247 | F | 49 | 02/18/11 | 02/19/11 |

DURRANI, ABUBAKAR

KATRINA S ALLEN
5608 ZOAR RD LOT 227

MORROW            OH    45103

R Return this portion with your payment

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACTIVITY | | TRANSACTION AMOUNT |
|---|---|---|---|---|---|
| 02/15/11 | 1 | 300 | ABO TYPE | 86900 | 27.00 |
| 02/15/11 | 1 | 300 | ANTIBODY SCREEN, EACH INCUBATION | 86850 | 50.00 |
| 02/15/11 | 1 | 300 | RH | 86901 | 27.00 |
| 02/15/11 | 1 | 301 | COMPREHENSIVE METABOLIC | 80053 | 80.00 |
| 02/15/11 | 1 | 305 | CBC W/O DIFFERENTIAL | 85027 | 49.00 |
| 02/15/11 | 1 | 305 | PARTIAL THROMBOPLASTIN TIME | 85730 | 46.00 |
| 02/15/11 | 1 | 305 | PROTHROMBIN TIME | 85610 | 30.00 |
| 02/15/11 | 1 | 307 | URINALYSIS | 81003 | 17.00 |
| 02/15/11 | 1 | 306 | STAPH AUREUS | 87081 | 50.00 |
| 02/18/11 | 1 | 300 | PHLEBOTOMY | 36415 | 17.00 |
| 02/18/11 | 4 | 121 | SEMI PRIVATE MED/SURG | | 1,095.00 |
| 02/18/11 | 1 | 710 | PRE OP LEVEL 1 EVERY 1/2 HOUR | | 0.00 |
| 02/18/11 | 15 | 370 | ANES COMPLEX (46 +) | | 589.00 |
| 02/18/11 | 204 | 370 | ANES COMPLEX (30 - 45) ADDITIONAL | | 300.00 |
| 02/18/11 | 1 | 360 | ANES COMPLEX - ADDITIONAL 1 MINUTE | | 4,080.00 |
| 02/18/11 | 219 | 360 | OR - CONTRACTED SERVICE - 1ST HALF | | 8,978.00 |
| 02/18/11 | 1 | 710 | OR - CONTRACTED SERVICE - EA ADDIT | | 18,396.00 |
| 02/18/11 | 1 | 710 | PACU TYPE 4 0-60 | | 939.00 |
| 02/18/11 | 1 | 710 | PACU TYPE 4 ADD 30 | | 368.00 |
| 02/18/11 | 1 | 710 | PACU TYPE 4 ADD 30 | | 368.00 |
| 02/18/11 | 5 | 278 | PACU TYPE 4 ADD 30 | | 368.00 |
| 02/18/11 | 5 | 278 | SCR CANN MA CDH 5.5 LEG 6.5X45 | | 20,484.90 |
| 02/18/11 | 1 | 278 | SET SCR F/G4 INT HEX | | 2,668.80 |
| 02/18/11 | 1 | 278 | CAGE CLYDESDAL PEEK IB 6 12X45 | | 11,294.48 |
| 02/18/11 | 2 | 278 | CAGE CLYDESDAL PEEK IB 6 10X45 | | 11,294.48 |
| 02/18/11 | 1 | 272 | ROD PRE-BENT M8 5.5X70MM TI | | 2,747.08 |
| 02/18/11 | 1 | 272 | PIN STABILITY 1CM | | 979.29 |
| 02/18/11 | 1 | 272 | PROBE PDCLE ACCSS LNG | | 1,012.50 |
| 02/18/11 | 1 | 272 | KNF DISCECTOMY BAYNT | | 998.24 |
| 02/18/11 | 1 | 272 | LT SOURC QUAD ILLUMINATION SYS | | 1,541.59 |
| 02/18/11 | 4 | 272 | DIL LG DISP | | 737.10 |
| 02/18/11 | 1 | 278 | NDL PK 2 TRCR TIP | | 1,979.64 |
| 02/18/11 | 5 | 278 | GWIRE SHARP 350MM | | 179.01 |
| 02/18/11 | 1 | 272 | GWIRE SEXTANT GUID BLNT | C1769 | 968.75 |
| 02/18/11 | 1 | 272 | BUR LEGEND MTCH HD 14CMX3MM | C1769 | 197.45 |
| 02/18/11 | 1 | 278 | BLD SET SPINE SHAVER ANG 4.0 | | 938.25 |
| | | | INFUS SET BONE GRFT SM | | 9,354.29 |

*Need Help?*

| Questions: | Billing Disputes: | Customer Service Hours: |
|---|---|---|
| pfs@uchealth.com | UC Health Attn: Billing Disputes | M -TH 8AM - 9PM, F 8AM - 4:30PM |
| | 3200 Burnet Ave Cincinnati, OH 45229 | 513-585-7800 or 1-800-277-0781 |



CONTINUED

# UC Health

P.O. Box 740117
Cincinnati, OH 45274-0117

**ITEMIZED BILL**

TAX ID: 311588499

04/24/13

2 of 5

ALLEN, KATRINA
WEST CHESTER HOSPITAL

| ACCOUNT NUMBER | | | ADMIT | DISCHARGE |
|---|---|---|---|---|
| 220090247 | F | 49 | 02/18/11 | 02/19/11 |

2

DURRANI, ABUBAKAR

KATRINA S ALLEN
5608 ZOAR RD LOT 227

MORROW          OH  45103

® Return this portion with your payment

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACCOUNT | | TRANSACTION AMOUNT |
|---|---|---|---|---|---|
| 02/18/11 | 1 | 278 | FOAM BIOACT VITOSS PACK 5CC | | |
| 02/18/11 | 1 | 460 | RC INCENTIVE SPIR TX | | 3,051.00 |
| 02/18/11 | 1 | 320 | DIAG LS SPINE 2 OR 3 VIEWS | 94150 | 0.00 |
| 02/18/11 | 1 | 320 | DIAG FLOURO > 1 HOUR | 72100 | 288.00 |
| 02/18/11 | 1 | 251 | CALCIUM CHLORIDE 100MG/ML VIAL IV | 76001 | 754.00 |
| 02/18/11 | 1 | 636 | DIPHENHYDRAMINE HCL 50MG/ML VIAL I | J1200 | 25.10 |
| 02/18/11 | 1 | 637 | DOCUSATE SODIUM 100MG CAPSULE | | 23.30 |
| 02/18/11 | 1 | 637 | GABAPENTIN 300MG CAP PO | | 1.65 |
| 02/18/11 | 1 | 636 | HYDROMORPHONE HCL 2MG/ML DIS SYR I | J1170 | 3.95 |
| 02/18/11 | 2 | 636 | HYDROMORPHONE HCL 2MG/ML DIS SYR I | J1170 | 28.05 |
| 02/18/11 | 1 | 250 | LIDOCAINE 2% AMP | | 28.05 |
| 02/18/11 | 1 | 637 | METHOCARBAMOL 500MG TAB PO | | 27.90 |
| 02/18/11 | 2 | 637 | METHOCARBAMOL 500MG TAB PO | | 4.40 |
| 02/18/11 | 1 | 636 | MIDAZOLAM 1MG/ML 2ML VIAL | | 4.40 |
| 02/18/11 | 1 | 636 | MORPHINE SULFATE 1MG/ML VIAL INJ | J2250 | 25.40 |
| 02/18/11 | 1 | 637 | NICOTINE 21MG/24HR PATCH TD | J2270 | 43.95 |
| 02/18/11 | 1 | 636 | ONDANSETRON HCL 2MG/ML VIAL IV | | 8.55 |
| 02/18/11 | 1 | 636 | PERPHENAZINE 4MG TAB PO | J2405 | 22.45 |
| 02/18/11 | 1 | 636 | PHENYLEPHRINE HCL 10MG/ML VIAL 1 M | Q0175 | 5.65 |
| 02/18/11 | 1 | 636 | RINGERS SOLUTION, LACTATED IVSL IV | J2370 | 33.25 |
| 02/18/11 | 1 | 636 | RINGERS SOLUTION, LACTATED IVSL IV | J7120 | 78.25 |
| 02/18/11 | 1 | 636 | RINGERS SOLUTION, LACTATED IVSL IV | J7120 | 78.25 |
| 02/18/11 | 1 | 637 | RINGERS SOLUTION, LACTATED IVSL IV | J7120 | 78.25 |
| 02/18/11 | 2 | 258 | SCOPOL HB 1.5MG/72HR PATCH TD | J7120 | 78.25 |
| 02/18/11 | 1 | 258 | SODIUM CHLORIDE0.9% IVSL IV 100ML | | 30.15 |
| 02/18/11 | 1 | 250 | SODIUM CHLORIDE 0.9% IVSLIV 500ML | | 81.20 |
| 02/18/11 | 1 | 637 | THROMBIN 5MU VIAL TOP | | 77.65 |
| 02/18/11 | 1 | 637 | TOPIRAMATE 25MG TABLET | | 194.05 |
| 02/18/11 | 1 | 636 | TOPIRAMATE 100MG TABLET | | 4.00 |
| 02/18/11 | 1 | 637 | DEXAMETHASONE 4MG/ML INJECTION 5ML | J1100 | 4.25 |
| 02/18/11 | 1 | 636 | ESCITALOPRAM OXALATE 10MG TAB | | 23.30 |
| 02/18/11 | 1 | 636 | FENTANYL 250 MCG/5 ML AMP INJ | | 12.80 |
| 02/18/11 | 1 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J3010 | 27.75 |
| 02/18/11 | 1 | 251 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 22.65 |
| 02/18/11 | 1 | 251 | LORAZEPAM 2MG/ML 1ML VIAL | J1100 | 22.65 |
| 02/18/11 | 3 | 251 | BUPIVACAINE HCL 0.5%W/EPI VIAL-10M | | 26.25 |
| 02/18/11 | 1 | 258 | CLINDAMYCIN 600MG/D5W 50ML GALAXY | | 34.90 |
| | | | | | 111.15 |

*Need Help?*

**Questions:**
pts@uchealth.com

**Billing Disputes:**
UC Health Attn: Billing Disputes
3200 Burnet Ave Cincinnati, OH 45229

**Customer Service Hours:**
M -TH 8AM - 9PM, F 8AM - 4:30PM
513-585-7600 or 1-800-277-0781



CONTINUED



# MARY L. SWAIN
## BUTLER COUNTY CLERK OF COURTS

L000340761

**WEST CHESTER HOSPITAL LLC**
**SERVE: GH&R BUSINESS SVCS INC**
**511 WALNUT STREET**
**1900 FIFTH THIRD CENTER**
**CINCINNATI, OH 45202**

---

Date:    April 2, 2015                              Case No. : CV 2015 03 0793
                   KATRINA ALLEN vs. ABUBAKAR ATIQ DURRANI MD et al

---

### SUMMONS ON COMPLAINT BY CERTIFIED MAIL
### COURT OF COMMON PLEAS, BUTLER COUNTY, OHIO

To the above named party: You are hereby summoned to answer a complaint that has been filed against you in the Butler County Common Pleas Court by the plaintiff(s) named herein. A copy of the complaint is attached.

You are required to serve upon the plaintiff(s) attorney, or upon the plaintiff(s) if there is no attorney of record, a copy of your answer to the complaint within 28 days after receipt of this summons, exclusive of the day of service. The answer must be filed with this court within three days after service on Plaintiff's attorney.

The name and address of the plaintiff(s) attorney is as follows:

> MATTHEW J HAMMER
> THE DETERS LAW FIRM PSC  635 WEST 7TH STREET, SUITE 401
> CINTI, OH   45203

If you fail to appear and defend, judgment by default may be taken against you for the relief demanded in the complaint.

**MARY L. SWAIN**
Butler County Clerk of Courts

*Mary L. Swain*

By: <u>Kristen Merkle</u>
Deputy Clerk

GOVERNMENT SERVICES CENTER ● 315 HIGH STREET ● SUITE 550 ● HAMILTON, OHIO 45011-6016

---



# MARY L. SWAIN
## BUTLER COUNTY CLERK OF COURTS

L000340762

**UC HEALTH**
**SERVE: GH&R BUSINESS SVCS INC**
**511 WALNUT STREET**
**1900 FIFTH THIRD CENTER**
**CINCINNATI, OH 45202**

---

Date:     April 2, 2015                              Case No. : CV 2015 03 0793
          KATRINA ALLEN vs. ABUBAKAR ATIQ DURRANI MD et al

---

### S U M M O N S   O N   C O M P L A I N T   B Y   C E R T I F I E D   M A I L
### C O U R T   O F   C O M M O N   P L E A S ,   B U T L E R   C O U N T Y ,   O H I O

To the above named party: You are hereby summoned to answer a complaint that has been filed against you in the Butler County Common Pleas Court by the plaintiff(s) named herein. A copy of the complaint is attached.

You are required to serve upon the plaintiff(s) attorney, or upon the plaintiff(s) if there is no attorney of record, a copy of your answer to the complaint within 28 days after receipt of this summons, exclusive of the day of service. The answer must be filed with this court within three days after service on Plaintiff's attorney.

The name and address of the plaintiff(s) attorney is as follows:

     MATTHEW J HAMMER
     THE DETERS LAW FIRM PSC  635 WEST 7TH STREET, SUITE 401
     CINTI, OH   45203

If you fail to appear and defend, judgment by default may be taken against you for the relief demanded in the complaint.

**MARY L. SWAIN**
Butler County Clerk of Courts

*Mary L. Swain*

By: <u>Kristen Merkle</u>
Deputy Clerk

---

GOVERNMENT SERVICES CENTER ● 315 HIGH STREET ● SUITE 550 ● HAMILTON, OHIO 45011-6016

---